354 P.2d 533

**STATE of New Mexico, Plaintiff-Appellee,**

v.

**James TURNBOW, Calvin Carter and Rita M. Turnbow, Defendants-Appellants.**

No. 6594.

Supreme Court of New Mexico.

July 30, 1960.

Paul R. Dillard, John F. Loehr, George A. Graham, Jr., Farmington, for appellants.

Hilton A. Dickson, Jr., Atty. Gen., Philip R. Ashby, Boston E. Witt, Asst. Attys. Gen., for appellee.

McGHEE, Chief Justice.

Harry Smouse, the proprietor of a roadside liquor store in San Juan County, was shot and killed during an attempt to rob his store on January 25, 1958, at about 11:30 p.m.

James F. Turnbow and his wife, Rita M. Turnbow, together with Calvin L. Carter, were jointly indicted for the crime and were convicted of murder in the first degree. The jury recommended leniency for Mrs. Turnbow and Calvin Carter and they were sentenced to life imprisonment. No recommendation of leniency having been made for James Turnbow, he was sentenced to die in the state gas chamber. James and Rita Turnbow have appealed their convictions.

Both of the appellants object to the refusal of the trial court to grant their motions for separate trials, a severance having been requested on the grounds, among others, that the defenses of husband and wife were mutually antagonistic; that if extrajudicial statements made by either of them amounting to confessions were proved and placed in evidence, this would be prejudicial as to the other; and that their testimony would be incompetent against each other upon a joint trial but that if severance were granted each of them might call the other as a witness in defense.

The granting of a separate trial to defendants who are jointly indicted is, in New Mexico, a matter resting in the discretion of the trial court. State v. Lord, 1938, 42 N.M. 638, 84 P.2d 80; State v. Ochoa, 1937, 41 N.M. 589, 72 P.2d 609; State v. Watts, 1930, 35 N.M. 94, 290 P. 738; State v. Smith, 1925, 30 N.M. 364, 234 P. 467; State v. McDaniels, 1921, 27 N.M. 59, 196 P. 177; and State v. Starr, 1917, 24 N.M. 180, 173 P. 674, error dismissed, 254 U.S. 611, 41 S.Ct. 61, 65 L.Ed. 437.

In the Ochoa case, quoting from People v. Fisher, 1928, 249 N.Y. 419, 164 N.E. 336, which in turn quotes from People v. Snyder, 1927, 246 N.Y. 491, 159 N.E. 408, the scope of the determination to be made on a motion for severance by the trial court and on appeal is stated, as follows [41 N.M. 589, 72 P.2d 620]:

"The question always presented by such a motion (for severance) is whether a jury can properly weigh the

testimony upon the various issues which may arise. 'The decision of the trial court rendered before the trial is dictated by reasonable anticipation based on the facts then disclosed. The decision of this court rendered upon a review of the trial itself rests upon determination of whether the prophesy has been realized.' "

In the Ochoa case we did not include the sentence immediately preceding the matter quoted from the Fisher case, which is as follows [249 N.Y. 419, 164 N.E. 338]:

"The test is whether a separate trial will assist or impede the proper administration of justice and secure to the accused the right of a fair trial."

■ We believe the inclusion of this sentence is necessary to fully describe the ultimate functions of the trial court and of this court in passing on the denial of a motion for severance, although, of course, such purpose of inquiry has always been implicit in our rule.

Our statute disqualifying spouses as witnesses against each other in criminal trials is, as follows:

"*Husband and wife—Competency as witnesses.*—Hereafter the husband or wife of any defendant in any trial on a prosecution for crime before any court or officer authorized to hear or try said prosecution, shall be a competent witness to testify in favor, but not against such defendant; Provided that such husband or wife shall be a competent witness to testify against any such defendant where the prosecution is for any unlawful assault or violence forcibly committed by the defendant on the person of such witness; and Provided further, that such wife shall be a competent witness to testify against her husband when such husband is being prosecuted for the crime of abandonment of, or wilful failure to support his wife or family." § 41–12–20, N.M.S.A.1953 Comp. (Laws 1889, ch. 10, § 1; Laws 1935, ch. 35, § 1.)

Another of our statutes provides:

"*Consent necessary.*—In any proceeding, trial or examination in any court in the state of New Mexico, in any prosecution for incest, bigamy, polygamy, unlawful cohabitation, or adultery, the lawful husband or wife of the accused person, shall be a competent witness, and may be called, but shall not be required to testify in such proceeding, trial or examination, without the consent of such husband or wife so called as a witness." § 41–12–21, N.M.S.A.1953 Comp. (Laws 1909, ch. 98, § 1).

As to the right of a defendant to testify in his own behalf, our rule provides:

"In the trial of all indictments, informations, complaints and other pro-

ceedings against persons charged with the commission of crimes, offenses, and misdemeanors in the courts of this state, the person so charged shall, at his own request but not otherwise, be a competent witness. His failure to testify shall create no presumption against him, but may be the subject of comment or argument. In trials in the district court such comment or argument shall be within the discretionary control of the court, and shall entitle the accused to an instruction that the jury shall indulge no presumption against the accused because of his failure to testify." Trial Court Rule 45–504 (§ 41–12–19, N.M.S.A.1953 Comp.).

On the state's case in chief, two statements of Rita Turnbow were admitted in evidence as state's exhibits 34 and 35. These statements contained matter incriminating James Turnbow. Later, in the defendants' case, James Turnbow testified that he did not recall anything which had occurred after 7:00 p.m. on the night in question because he had suffered a "blackout" of his memory. He accredited his "black-out" to the fact that he had sustained a severe electrical shock in 1954 while he was working on a drilling rig in the oil field near Andrews, Texas. He further testified that as a result of this injury he had suffered acute headaches which he alleviated first with aspirin and headache powders and later with barbitu-

ates known as "beanies" and "yellow jackets." In addition to the headaches he suffered dizzy spells and blackouts lasting various lengths of time. Turnbow's direct testimony was not criminatory as to his wife, but on cross-examination the state was allowed to impeach him by interrogating him about a statement made by him to police officers. In this interrogation, every question and answer in the statement was read to the witness and he was asked if he had made such statement. Again, on rebuttal, each statement was repeated and a police officer testified such question had been asked and such answer given. This statement contained matter which was criminatory as to Mrs. Turnbow.

When Mrs. Turnbow took the stand in her defense, she testified at length about the events of the day and evening in question. She acknowledged the statements she had given to officials and introduced in evidence as state's exhibits 34 and 35, and the effect of her testimony was to elaborate on answers contained in those statements and to present the defense of coercion by her husband. She was allowed to detail numerous instances during her marriage when her husband had committed acts of violence against her and committed or threatened to commit violence against others.

Objections to the foregoing evidence were made on behalf of both the husband and wife, which were overruled by the

court on the basis, apparently, that the parties would be afforded sufficient protection against prejudicial error if the jury were specially instructed from time to time and also given general instructions not to consider the evidence of one spouse against the other.

On this appeal, it is the contention of the state that the instructions to the jury did serve to cure any possible error committed in allowing the spouses to give testimony against each other.

It is not contended that the case comes under any of the statutory exceptions allowing testimony by one spouse against the other, and such contention would obviously not be permissible in this case. Nor is there any legislative or other public policy which would bring the testimony under the rule announced in Wyatt v. United States, 1960, 80 S.Ct. 901, 4 L.Ed.2d 931.

It cannot be questioned that if a severance had been granted to these parties, each of them would have been able to exclude the testimony of his spouse against him, but could have called such spouse as a witness for his defense. United States v. Meyers, 1908, 14 N.M. 522, 99 P. 336; Hawkins v. United States, 1958, 358 U.S. 74, 79 S.Ct. 136, 3 L.Ed.2d 125.

By compelling the husband and wife to be tried jointly, each of them was denied this right; and, instead, they were forced to rely on the effect of instructions to overcome the prejudicial effect of the criminatory testimony of their spouse, or else be denied the right to testify in their own behalf.

We are of the opinion the lower court's refusal to grant James and Rita Turnbow separate trials was an abuse of discretion, as that course was obviously the only way in which § 41–12–20, N.M.S.A. 1953 Comp., and Trial Court Rule 45–504 (§ 41–12–19, N.M.S.A.1953 Comp.) could be given effect.

The state has called our attention to two Kentucky cases: Allen v. Commonwealth, 1909, 134 Ky. 110, 119 S.W. 795, 20 Ann. Cas. 884; and Martin v. Commonwealth, 1937, 269 Ky. 688, 108 S.W.2d 665. These cases stand for the proposition that a husband and wife who are jointly tried may testify for themselves, but when they are tried separately, one cannot be a witness for the other. In both cases the husband and wife were given separate trials, and in both of them the defendant sought to have his spouse testify in his favor. In Kentucky, any defendant jointly indicted with another may demand a separate trial as a matter of right. Carroll's Kentucky Codes, Russell's Revision, Criminal Code of Practice, § 237. These cases are not authority for the proposition that a husband and wife may testify against each other in a joint trial.

Another line of authority offered to us concerns the competency of the wife of one defendant to testify as a witness for a co-defendant of her husband, even though the effect of the wife's testimony implicates her husband in the commission of the crime. These cases are: Lawson v. Commonwealth, 1914, 160 Ky. 180, 169 S.W. 587, L.R.A.1915D, 972; State v. Adams, 1888, 40 La.Ann. 213, 3 So. 733; State v. Wright, 1889, 41 La.Ann. 600, 6 So. 135; and Smartt v. State, 1904, 112 Tenn. 539, 80 S.W. 586. In all of these cases it was specified that the jury must be cautioned not to consider the testimony of the wife against her husband. It seems to us that the courts in these cases followed the only course open to them. The defendants could not be denied the right to produce witnesses in their defense and the courts should not have to take the position of requiring the defendants to have separate trials in order to protect this right.

These cases, however, do not raise the situation now before this court. Here a severance was properly requested, was supported by affidavits of the applicants disclosing that they anticipated their defenses would be antagonistic. No reason was given by the lower court for its actions in denying severance, but if the decision was based on any concern for expediency or convenience of prosecution, these matters are subservient to the important inquiry: Whether a separate trial will assist or impede the proper administration of justice and secure to the accused the rights of a fair trial.

We do not decide that instructions cannot cure the prejudicial effect of testimony given by one spouse against the other. The extent of our holding is that when a husband and wife are jointly indicted for a crime and one or the other or both of them request severance under the circumstances presented in this case, then it is an abuse of discretion to deny the application for severance.

James Turnbow has also objected to being tried jointly with Calvin L. Carter on the basis that their defenses were antagonistic. Since Turnbow's conviction must be reversed, it is not necessary for us to rule on this point, but in order that there shall be no doubt as to the effect of our ruling as to motions for severance, we note that the objection as to joinder with Carter is without merit under the long line of New Mexico decisions cited at the beginning of this opinion.

Another objection of Turnbow argued under the point as to severance respects the testimony given by Carter at the trial. His testimony amounted to a confession of participation in the crime and the assertion of the defense that he acted under compulsion and duress of Turnbow. Turnbow argued that the lower court should have admonished the jury not to consider it

against him and that the jury should also have been so instructed. The trial court, on the contrary, admitted the testimony without admonition and instructed the jury they could consider Carter's testimony against his codefendants.

■ In this state an accused may be convicted upon the testimony of an accomplice, even though it is uncorroborated, although it is proper for the court to admonish the jury to view it with suspicion and receive it with caution. Still, the weight to be given the testimony is to be determined by the jury. Territory v. Kinney, 1884, 3 N.M., Gild., 143, 2 P. 357; State v. Kidd, 1929, 34 N.M. 84, 278 P. 214; State v. Chitwood, 1930, 34 N.M. 505, 285 P. 499; and State v. Armijo, 1931, 35 N.M. 533, 2 P.2d 1075.

■ Turnbow was allowed the full right of cross-examination of Carter under his constitutional right of confrontation. State v. Martin, 1949, 53 N.M. 413, 209 P.2d 525.

After the direct examination of James Turnbow wherein he described the injury he had received by electric shock in 1954, the resulting headaches, dizzy spells and blackouts, and the medication he took to relieve his pain, and after Turnbow had stated in answer to numerous questions that he had no recollection of any events after about 7:00 o'clock on the night of the murder, the state was allowed to cross-examine Turnbow with regard to a statement he had given police officials the night after his arrest. The statement amounted to a confession, but it was not qualified for admission as such. In fact, at the time the confession was made Turnbow was in the hospital, having been shot in the abdomen; he was in bed, was being given shots for pain every two, three or four hours and did not know what was going on. All these matters were brought out on cross-examination by the district attorney. It is not contended here that the statement was properly admissible as a confession and it was not sought to be introduced as such. The statement was used for the purpose of impeaching Turnbow with proof of prior inconsistent statements. Yet, by the device of reading the questions and answers from the statement and asking the witness if he had not made such statements in response to such questions, the district attorney got the entire confession into the record. Later, on rebuttal, Sheriff Dan Sullivan testified for the state about Turnbow's statement. Again, every question and answer in the statement was put to the witness, who testified Turnbow had made such answers to such questions.

Turnbow's counsel objected throughout to the use of the statement on the ground that it amounted to a confession and the state had not laid a foundation for its admission in evidence.

The general rule respecting impeachment of a criminal defendant on the basis of prior inconsistent statements is set forth in Wigmore on Evidence, § ,821, as follows:

" * * * But when the accused's statement is *really a confession, i.e.,* an acknowledgment of guilt, it cannot be used in the latter manner (for impeachment purposes) if it is by the confession-rule inadmissible as such; for the confession-rule must always be applied to confessions, even when it is desired to use them merely in testimonial impeachment of the accused, and even though * * * the accused as a witness may be impeached like other witnesses."

Harrold v. Territory, 8 Cir., 1909, 169 F. 47 is a leading case exemplifying this rule. It is there said that a witness may not be impeached or contradicted by incompetent evidence. Involuntary confessions of accused persons are inadmissible to impeach them as witnesses on the same ground that hearsay and all other incompetent evidence is inadmissible to impeach other witnesses, because they are unworthy of belief. Statements are called to our attention to the effect that the limit of cross-examination is discretionary with the trial court, but it is only discretionary without the limits of the right of the party against whom a witness is called to a full and fair cross-examination of him upon the subjects of his direct examination, and the right of the party in whose behalf he testifies to restrict his cross-examination to the subject of his direct examination.

We feel that the rule as stated by Wigmore and in Harrold v. Territory, supra, is the better reasoned and the majority rule. It should be noted, however, that there are several jurisdictions which follow a contrary rule, on the theory that the defendant waives his privilege against self-crimination when he takes the stand as a witness in his own defense. See, for example, State v. Broadbent, 1903, 27 Mont. 342, 71 P. 1; State v. Fisher, 1939, 108 Mont. 68, 88 P.2d 53; and Wigmore, supra , § 821 at 242, n. 3.

The rule which apparently has been followed in New Mexico until the present time is that which was announced in State v. Butler, 1934, 38 N.M. 453, 34 P.2d 1100, 1101, and we have therefore been considered as one of those states following the minority rule. It thus becomes necessary that we quote from that case at some length in order to show the authorities there relied on and the way in which they were construed.

"At the ouset of the statement made by appellant in the New Mexico penitentiary, he said: 'In my previous statement made to L. A. Kindal, Special Agent, I stated that a man by the name of Strange, and one Tony

Valdez, and a man by the name of Bussett, was connected with this murder; at this time I desire to correct that statement eliminating those individuals from any connection with this matter, and tell the truth, regardless of circumstances, as to how the crime was committed.'

"This earlier statement had been made while appellant was in custody in Louisiana. The state made no use of it in chief, but it did cross-examine to some extent as to its contents. It was objected that such inquiries were not permissible until a foundation had been laid for reception of the statement as a confession. The court ruled: 'I have a set idea on this. It is like any other impeachment evidence so long as the instrument itself is not in.'

"We consider the ruling correct. The cross-examination appears to have proceeded according to Comp. St. 1929, §§ 45–604, 45–605 (§§ 20–2–1 and 20–2–2, N.M.S.A., 1953 Comp.). The right to inquire of the witness is not dependent upon a further right to show the falsity of his answer. Riggins v. State, 125 Md. 165, 93 A. 437, Ann.Cas.1916E, 1117.

"In State v. Fernandez, 37 N.M. 151, 19 P.(2d) 1048, 1050, we relied on the distinction between actual impeachment after foundation laid and 'the effort to obtain admissions from the witness himself.'

"In State v. Archer, 32 N.M. 319, 255 P. 396, we upheld the right to 'probe the conscience of the witness,' though his denial might be conclusive because of inability for one reason or another to dispute him.

"This principle is somewhat analogous to the right established in this state to question the witness as to specific misconduct or wrongdoing, holding the examiner bound by the answers. Cf. State v. v. Clevenger, 27 N.M. 466, 202 P. 687."

The sections referred to in the Butler case are, as follows:

"*Cross-examination of witness as to his previous inconsistent statements.*—Upon the trial of any cause a witness may be cross-examined as to previous statements made by him in writing or reduced to writing, relative to the subject-matter of the cause without such writing being shown to him, but if it is intended to contradict the witness by the writing, his attention must, before such contradictory proof can be given, be called to those parts of the writing which are to be used for the purpose of so contradicting him." § 20–2–1, N.M.S.A.

1953 Comp., formerly § 45–604, Comp. St. 1929.

*"Failure to admit making statement— Proof by other witness.*—If a witness, upon cross-examination as to a former statement made by him relative to the subject-matter of the cause, and inconsistent with his present testimony, does not distinctly admit that he did make such statement, proof may be given that he did in fact make it, but before such proof can be given the circumstances of the supposed statement, sufficient to designate the particular occasion, must be mentioned to the witness, and he must be asked whether or not he did make such statement." § 20–2–2, N.M.S.A., 1953 Comp., formerly § 45–605, Comp.St. 1929.

In Riggins v. State, the Maryland case cited in the Butler case, the prosecution was for statutory rape. The prosecuting witness testified the defendant had intercourse with her on numerous occasions before she was arrested; that when arrested she, with her father, went to see the prosecuting attorney; that the prosecuting attorney asked her several questions but she would not tell him anything. Upon the trial the witness was asked several questions relating to what she had told the prosecuting attorney. The lower court did not allow the questions and did not allow the witness to answer. Among the questions was the following: "Didn't you tell the State's Attorney that you never had intercourse with Riggins?" On appeal, the court held that the witness should have answered this question, for if she had made such prior inconsistent statement, the evidence thereof should have gone to the jury. Much of this decision, necessarily, concerns the right of the state to shield communications between prosecuting witnesses and prosecuting attorneys from publication.

The Fernandez case relied upon in the Butler case concerned a prosecution for conspiracy to rob. One of the conspirators became a witness for the state. On cross-examination of this witness, he stated he had formed an impression that one of the conspirators was coercing another with a pistol. This surprised the district attorney and he asked a series of questions of the witness implying that although the witness had talked with the district attorney several times before the trial that the impression and facts on which the statement as to coercion was based had not been mentioned in any of those discussions before trial. Objection was made by one of the conspirators not involved in the coercion and not present when it supposedly occurred, that the prosecution had impeached its own witness. The court ruled there was nothing prejudicial to the objector in the testimony, and went on to say there was probably no error in any case: "If the ruling be deemed to have sanctioned im-

peaching evidence, the district attorney did not take advantage of it. He merely employed a latitude of examination in the effort to obtain admissions from the witness himself."

A. similar question arose in the Archer case mentioned in Butler. A witness testified to several damaging facts against the defendants. On cross-examination it appeared that the witness had called the sheriff immediately after the commission of the crime in question, homicide, and asked the sheriff to call upon him for information about the crime. The witness gave the sheriff some information, but said there were facts which he withheld from the sheriff, and these facts he related at the trial. The district attorney, to strenghen the credibility of his witnesses asked on redirect examination whether the witness had not mentioned the facts in a written statement given to the district attorney. The witness answered that he had done so, but the court struck the answer, apparently on the ground the writing had to be produced. Later, counsel for one of the defendants renewed the question, which offer was denied by the court. This denial was held to be error. Much was made of the privileged nature of communications between informers and prosecuting officers. The court said, however, that the privilege could not be invoked in this case:

"The case at bar, however, is not a case of a civil action for libel and slander. This is a case where a witness on the stand for the prosecution was sought to be probed as to his credibility by examining him as to whether in his account to the district attorney he had included the important statements testified to by him at the trial. The witness claimed no exemption for himself; the objection was made by the district attorney. No claim was made that any state secret was involved, nor that the interest of the state could in any way be impaired. Under such circumstances, there would seem to be no reason for the exemption, either for the protection of the witness or to guard the interests of the state."

The extent of the court's ruling in the Archer case was, however, restricted to cross-examination of the witness, and the court did not express any opinion with regard to whether the district attorney could be put on the stand to contradict the witness with proof of the prior statement.

Finally, in State v. Clevenger, last relied on in the Butler case, it was ruled that a witness for the defense could be interrogated on cross-examination concerning specific acts of moral misconduct and wrongdoing, but that no extrinsic evidence or independent evidence regarding such matters could be admitted, as the cross-examiner was concluded by the answers given by the witness. The witness was not the

accused, but was a witness in his behalf in a prosecution for rape.

It is apparent from the cases relied upon in Butler that the court was there concerned with the question of whether or not a witness could be impeached when for some reason or other the examiner could not lay a foundation for and introduce proof impeachment by another witness as to a prior inconsistent statement or some other circumstance damaging to the credibility of the witness sought to be impeached.

While Butler holds that some inquiry may be made of an accused in respect of prior statements made by him which are not admitted as confessions, it is obvious the decision stands only for a very limited inquiry, and one which is terminated upon a denial of the statement by the accused.

■ The holding in the Butler case is not authority for impeachment by independent proof of matters amounting to incompetent evidence, but is, at the most, authority for the proposition that the state may probe the conscience of the accused but is concluded by his response. Accordingly, it was error for the trial court to allow Sheriff Dan Sullivan to testify regarding the statement of Turnbow.

We have reconsidered the holding of the Butler case and are further of the opinion that the rule of that case as applied to the facts in this case represented a denial of due process. The Attorney General, after quoting §§ 20–2–1 and 20–2–2, set out hereinabove, concludes his argument under this point as follows:

"The New Mexico Court has ruled that this (these) section(s) appl(y) to criminal cases. State v. Butler, 38 N. M. 453, 34 P.2d 1100 (1934). Note that in the Butler case, the Court ruled where a statement has been made by a criminal defendant, but the state made no use of it in its case in chief, but cross-examined the defendant as to its contents, Section 20–2–1 allowed such examination, even though foundation had not been laid for reception of the statement as a confession. Further, the nature of this cross-examination is within the discretion of the trial judge. State v. Burkett, 33 N.M. 159, 262 P. 532 (1927), [State v. Roybal] 33 N.M. 540, 273 P. 919 (1928).

"There, although we concede that this practice may have the effect of getting an extra-judicial confession before the jury, we contend that such practice is allowable under the statutes and cases just cited, and, therefore, does not constitute prejudicial error."

■ Before a confession may be introduced into evidence as such it must be established to have been voluntarily made and not to have been extracted from an accused through fear, coercion, hope of

reward or other improper inducements. Until a prima facie showing is made as to these matters, a confession cannot be received in evidence because it is untrustworthy. Recently, in State v. Armijo, 1958, 64 N.M. 431, 329 P.2d 785, we upheld the right of a defendant to be heard by the court, out of the presence of the jury, as to the voluntariness of his purported confession. We there quoted the following language from State v. Foster, 1919, 25 N.M. 361, 183 P. 397, 398, 7 A.L.R. 417:

"There is no more convincing evidence to the ordinary man than a confession of guilt, and where a confession is admitted, under an instruction to the jury to determine whether it is voluntary or involuntary, and to consider it in the former case, or in the latter case to reject it, the probabilities are, unless the confession was extorted under circumstances calculated to arouse sympathy for the defendant, that the average jury will consume but little time in determining the question of whether the confession was voluntary or involuntary, but will in the great majority of cases say the prisoner has confessed, and therefore is guilty beyond a reasonable doubt."

In the present case the jury was given the following instruction:

"17. You are instructed that when the prosecution, in endeavoring to impeach the credibility of defendant James F. Turnbow, read to him certain questions and answers which he stated he did not remember having been put to him, and answered, was not establishing the truth of such answers. For this reason, you are not to consider the content and substance of said questions and answers which were read as being admissions or confessions of defendant James F. Turnbow, for the voluntary nature of same was not shown by the prosecution.

"The same rule would apply to the rebuttal testimony of Sheriff Sullivan, who testified with regard to questions put to and answers given by defendant James F. Turnbow on January 26, 1958. You are not to regard those answers as admissions or confessions of said defendant, for the voluntary nature of same was not shown by the prosecution."

This instruction tells the jury it may disbelieve the witness on the basis of the prior statement, but it is not to believe the statement. The jurors are expected to be more discriminating than Hudibras of whom it was said: "Who could a hair distinguish and divide, the south from the southwest side."

■ Based upon the above, State v. Butler is hereby expressly overruled, insofar as it conflicts with what we have stated. Ab-

sent a proper showing to the satisfaction of the court that the confession is voluntary in point of law, the state may initially cross-examine a defendant as to whether he has made a statement contrary to his testimony, but upon his denial thereof or his claimed inability to recall, may proceed no further.

Both appellants make objections with respect to the sufficiency of the evidence to support the verdict of the jury, the correctness of the instructions as to the elements of the crime to be proved, and the sufficiency of proof of the corpus delicti. They urge that the lower court committed error in refusing to direct a verdict of acquittal. All of these charges of error arise from the following circumstances: By indictment of the San Juan County Grand Jury the defendants were accused of murder "in that they did murder Harry Smouse." In response to a motion by James F. Turnbow, the state filed a bill of particulars alleging, among other things:

"5. The murder of Harry Smouse was committed during the perpetration of a felony, to-wit, armed robbery, by the defendants."

Upon the trial the state did not prove that armed robbery had been committed, but there was ample evidence of an attempt to commit armed robbery. Several of the instructions to the jury made reference to attempts to perpetrate robbery as well as the perpetration of robbery, and, in effect, the jury was instructed it could find the defendants guilty of murder if Harry Smouse was killed while the defendants as principals or aiders and abettors were engaged in the perpetration or attempted perpetration of a felony. The precise issue, then, is whether the appellants could be convicted of first degree murder under the felony-murder rule for an attempt to commit a felony when the charge under the indictment and bill of particulars alleged the completion of the felony.

The appellants rely upon the general principle that the state is limited in its presentation of evidence to the matters alleged in the bill of particulars, citing, among other cases, United States v. Glasser, 7 Cir., 1940, 116 F.2d 690; People v. Whitmer, 1938, 369 Ill. 317, 16 N.E.2d 757; and United States v. Gouled, 1918, D.C.N.Y., 253 F. 239. On the other hand, the attorney general relies upon two lines of authority—first, that a charge of an attempt to commit a crime is included in the charge of the commission of the crime; and, second, that one who while fleeing from a place where he has committed a felony takes the life of another is guilty of murder in the perpetration of a felony. People v. Rupp, 1953, 41 Cal.2d 371, 260 P.2d 1; Compton v. People, 1928, 84 Colo. 106, 268 P. 577; State v. Allen, 1947, 163 Kan. 374, 183 P.2d 458; State v. Curtis, 1948, 149 Ohio St. 153, 78 N.E.2d 46; and Commonwealth ex rel. Scasserra v. Baldi, 1956, 180 Pa.Super. 176, 119 A.2d 611. They

also refer us to the case of State v. Rogers, 1956, 143 Conn. 167, 120 A.2d 409, 413. There a woman who was a proprietor of a package liquor store was shot and killed. The cash register in the store was rifled and about $60 was taken from it. The court there said:

"It is a play upon words to argue that the defendant was prejudiced by the court's charge discussing an attempt as well as a completed perpetration of a robbery. Whatever was done on the evening of November 21, 1953, involved the robbery of Mrs. Kennedy who, with her husband, owned the money in the cash register. Whether she was killed before the money was taken or whether she was killed moments thereafter, we fail to see that the court was in any way enlarging the letter of the indictment. An attempt at robbery is of the same significance as an actual robbery, if in either instance a life is taken. A charge of attempt is included within the charge of a completed offense. Both crimes are included in the definition of murder in the first degree contained in the statute * * * under which the defendant was charged. The indictment charges that the defendant 'did in perpetrating a Robbery murder one Dorothy Kennedy by shooting her.' The words of the statute 'in perpetrating, or in attempting to perpetrate, any * * * robbery' mean a killing done at any time within a sequence of events directly connected with a robbery and the escape from the scene of it. Upon the facts of this case, it is inconsequential whether the particular crime in the perpetration of which the killing occurred was actually completed or failed and for that reason could be described technically as merely an attempt. * * (Citing authorities and cases). Furthermore, the jury returned a verdict of guilty of murder in the first degree in perpetrating a robbery. This was consistent with the unchallenged claim of proof made by the state that the defendant took $60 from the cash register in the deceased's package store. The court's reference in its charge to an attempt to commit robbery manifestly did not affect the verdict."

In the foregoing case the defendant was charged with murder in the perpetration of a robbery and was convicted of murder in perpetration of a robbery, so that the facts of the case are not squarely in line with the present one where the defendants were charged with murder in the perpetration of a robbery and convicted of murder on evidence only of an attempt to commit robbery. It is also true that we are not concerned here with a *lesser* included offense such as are considered in Territory v. McGinnis, 1900, 10 N.M. 269, 61 P. 208; State v. Reed, 1934, 39 N.M. 44, 39 P.2d 1005, 102 A.L.R. 995. Instead, the precise effect of

the indictment and bill of particulars is to allege felony-murder in only one of the alternative ways in which the same can be committed under our statute, while the proof in the other alternative was the one involved.

In 27 Am. Jur., Indictment and Information, § 179, it is stated:

"A material variance between the indictment and the proof was to the manner, means or instrumentalities by which the offense was committed is fatal."

Thus, an information which charges the defendant with having received and aided in the concealment of several articles or pieces of property on a single specified day is not sustained by proof of the receipt of the several articles or pieces of property at different times. Hamilton v. State, 1937, 129 Fla. 219, 176 So. 89, 112 A.L.R. 1013. Likewise, an indictment charging abortion by the use of instruments is not established by proof of the administration of abortifacient substances. State v. Willson, 1924, 113 Or. 450, 230 P. 810, 39 A.L.R. 84. It has also been held that an indictment for killing by striking, wounding and throwing the victim into a well is not supported by evidence the defendant frightened the victim into insanity by an attempted burglary, so that the victim jumped into the well, on the basis that a charge of murder by physical violence was not supported by proof of felony-murder under these circumstances. Gipe v. State, 1905, 165 Ind. 433, 75 N.E. 881, 1 L.R.A., N.S., 419.

Again, we find a logical distinction between the foregoing cases and the appeal before us. In those cases, the methods, manners and means of committing the crime charged in the indictment or information did not necessarily include charges of another manner, method or means of committing the crime.

The case of People v. Greer, 1947, 30 Cal.2d 589, 184 P.2d 512, 516, contains a good statement of what constitutes a necessarily included offense:

"The test * * * of a necessarily included offense is simply that where an offense cannot be committed without necessarily committing another offense, the latter is a necessarily included offense."

See also Barbeau v. United States, 9 Cir., 1951, 193 F.2d 945; Hardrick v. State, 1958, 98 Ga.App. 649, 106 S.E.2d 342; Goldbaum v. United States, 9 Cir., 1953, 204 F.2d 74; State v. Love, 1955, 76 Idaho 378, 283 P.2d 925; Madison v. State, 1955, 234 Ind. 517, 130 N.E.2d 35; Carr v. State, 1950, 91 Okl.Cr. 94, 216 P.2d 333; and Martin v. State, 1948, 152 Tex.Cr.R. 261, 213 S.W.2d 548.

We apply the test of a necessarily included offense to the present case for two reasons. The first is that an indictment and bill of particulars charging the perpetra-

tion of an offense gives notice to the defendant that the state will prove all the elements thereof, and it would be impossible to establish all the elements of a killing in the perpetration of a robbery if matters were not proved which constituted an attempt to commit robbery. The attempt is an included crime, and the defendant cannot be surprised when the state introduces proof establishing an attempt although it may be unable to establish a completed robbery. Secondly, a person who is convicted or acquitted of a crime must not be subjected to another prosecution for the same offense. Thus, if the defendant were charged with forgery and convicted of that crime on evidence he had obtained money under false pretenses, in a state where both crimes are prohibited under independent statutory provisions, the defendant might be subject to a second prosecution for obtaining money under false pretenses. So it is that protection against surprise and protection against double jeopardy are fundamental considerations at the bottom of our law governing accusations of crime and proof of the corpus delicti.

We have carefully considered the indictment and bill of particulars in the present case, in the light of the evidence presented and the subsequent conviction, and are of the opinion these fundamental rights of the accused were not infringed thereby.

The appellant Rita Turnbow objects to the court's refusal to give certain instructions requested by her relating to the defense of coercion and to one given by the court on the subject relative to the quantum of proof necessary to overcome the presumption.

That the wife who was present and participating in the commission of a crime was presumed to be acting under the coercion of her husband was announced by Hawkins in 1762. See Hawkins, Pleas of The Crown, 4th Ed., 1762, Bk. 1, Chap. LXXII, Section 8, p. 192

This rule was followed in the United States and was accepted as the law of the land until June 27, 1960, when the Supreme Court of the United States repudiated it in the case of United States v. Dege, 80 S.Ct. 1589, 1591. The court stated:

"The fact of the matter is that we are asked to write into law a doctrine that parrot-like has been repeated in decisions and texts from what was given its authoritative expression by Hawkins early in the eighteenth century. * * * The pronouncement of Hawkins apparently rests on a case in a Year Book of 38 Edward III, decided in 1365. The learning invoked for this ancient doctrine has been questioned by modern scholarship. See Williams, The Legal Unity of Husband and Wife, 10 Mod.L.Rev., 16 (1947); and cf. Winfield, The History of Conspiracy (1921), § 27, p. 64, and § 37, p. 88. But

in any event the answer to Hawkins with his Year Book authority, as a basis for decision by the Supreme Court of the United States in 1960 construing a statute enacted in 1948, was definitively made long ago by Mr. Justice Holmes:

"'It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past.' Holmes, Collected Legal Papers, 187 (1920), reprinting The Path of the Law, 10 Harv.L.Rev. 457, 469 (1897).

"For this Court now to act on Hawkins's formulation of the medieval view that husband and wife 'are esteemed but as one Person in Law, and are presumed to have but one Will' would indeed be 'blind imitation of the past.' It would require us to disregard the vast changes in the status of woman—the extension of her rights and correlative duties—whereby a wife's legal submission to her husband has been wholly wiped out, not only in the English-speaking world generally but emphatically so in this country."

■ We agree that under present day conditions and relations between husband and wife the doctrine of presumption of the husband's coercion of the wife is out of date and not consistent with the facts, and we will follow the decision of the United States Supreme Court.

Under the new rule as just announced the defendant Rita Turnbow may not complain about the instructions on this point.

■ In the instruction given on the subject the court left it to the jury to determine whether James Turnbow and Rita Turnbow were husband and wife, and for fear this issue may creep into the case in another trial we say under the testimony in the case this issue should not have been submitted to the jury. The testimony upon which the state relied to dispute the marriage of these defendants was not sufficient to overcome the presumption of the validity of the subsequent marriage. In re Jubala's Estate, 1936, 40 N.M. 312, 59 P.2d 356; De Vigil v. Albuquerque & Cerrillos Coal Co., 1928, 33 N.M. 479, 270 P. 791; and Ferret v. Ferret, 1951, 55 N.M. 565, 237 P.2d 594. See also the cases collected in Annotations at 34 A.L.R. 464, 77 A.L.R. 741, and 14 A.L.R.2d 45.

■ Finally, Mrs. Turnbow complains because the district attorney was allowed over objection to question her about prior convictions of assault and battery and of being drunk and disorderly. The testimony elicited from Mrs. Turnbow was limited to the names of the offenses of which she had

been convicted and the time of their commission. Such cross-examination was proper. § 20–2–3, N.M.S.A. 1953 Comp; State v. Roybal, 1928, 33 N.M. 540, 273 P. 919; State v. Conwell, 1932, 36 N.M. 253, 13 P.2d 554; State v. Ocanas, 1956, 61 N.M. 484, 303 P.2d 390.

The convictions of appellants are reversed and remanded for new trial in accordance herewith.

It is so ordered.

COMPTON, CARMODY and MOISE, JJ., concur.

HARRIS, D. J., being absent from the State, not participating.